**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DEUTSCHE BANK, AG, | Civil Action No.: 09-cv-9784(RWS) |
| Plaintiff, | ECF Case |
| v. | |
| | **COMPLAINT** |
| BANK OF AMERICA, N.A. | |
| Defendant. | |

Plaintiff Deutsche Bank AG ("**DB**"), by and through its attorneys, Williams & Connolly LLP, as and for its Complaint against Defendant Bank of America, N.A. ("**BOA**"), as successor in interest to LaSalle Bank, National Association, alleges as follows:

**<u>NATURE OF CASE</u>**

1.      This is an action for (1) damages for breach of contract resulting from BOA's failure to secure and safeguard over $1.25 billion worth of cash and mortgage loans that it was contractually obligated to secure on behalf of DB and (2) contractual indemnity for the losses caused by BOA's negligent performance of its duties to DB.

2.      On December 13, 2007, DB invested $750 million in asset-backed commercial paper ("**ABCP**") issued by a special purpose entity called Ocala Funding, LLC ("**Ocala**").  On June 30, 2008, DB increased this investment by approximately $450 million to a total investment in Ocala's ABCP of approximately $1.2 billion.  On June 30, 2008, BNP Paribas Bank ("**BNP**," and collectively with DB the "**Secured Parties**") also invested approximately $481 million in the ABCP issued by Ocala.  DB's investment in Ocala was to be renewed on a

monthly basis, and Ocala was required to maintain at least $1.25 billion in cash and collateral as security against its obligations to DB.

3.　　Ocala was established for the sole purpose of providing funding for mortgage loans originated by Taylor, Bean & Whitaker Mortgage Corp. ("**TBW**").　Mortgages purchased by Ocala were required to conform to the requirements of, and were intended to be sold to, the Federal Home Loan Mortgage Corporation ("**Freddie Mac**"), a government-sponsored entity that is implicitly backed by the full faith and credit of the United States government.

4.　　Ocala's ABCP was structured to minimize risks to DB's investment.　Robust contractual mechanisms existed to ensure that DB's investment would be protected from credit risk, market risk, interest rate risk, the risk of bankruptcy by TBW, and the counterparty risk associated with dealing with TBW as originator of the mortgages.　In that regard, BOA assumed the responsibility to act as trustee, collateral agent, custodian, and depositary agent on behalf of the ABCP holders, including DB.

5.　　One vital mechanism protecting DB against risk was the requirement that DB's investment be at all times over-collateralized by a combination of cash and "dry" mortgages purchased by Ocala.　"Dry" mortgages are mortgages that have been reviewed by the lender and are actually in the lender's possession at the time the mortgage loan is acquired by the lender.　By contrast, "wet" funding of mortgages is riskier from the lender's perspective because financing is provided to a borrower before the mortgage note has been received and reviewed by the lender (i.e., when the ink on the mortgage note is still "wet").　The lender providing wet funding for TBW was Colonial Bank ("**Colonial**").　In making its investment in Ocala on June 30, 2008, DB insisted that its investment be used only for dry mortgages.

6.      DB's investment was further protected by the requirement that Ocala purchase only mortgages that satisfied the requirements of Freddie Mac, and DB obtained assurances from Freddie Mac that Freddie Mac would purchase mortgages held by Ocala in the event TBW became ineligible to sell mortgages to Freddie Mac itself.  In short, DB's investment was required at all times to be secured by a combination of cash and dry mortgages that readily could be sold to Freddie Mac.

7.      A number of protections existed to ensure the reliability of the collateral securing DB's investment.  First, Ocala was permitted to purchase only fully-documented and executed mortgages that were in the possession of a collateral agent representing the Secured Parties.

8.      Second, the only purpose for which Ocala could use the funds invested by DB (other than to repay DB or to cover other specified expenses) was to purchase such mortgages.  Any proceeds garnered from the subsequent sale of such mortgages were subject to the same limitation.

9.      Third, the Ocala facility could continue operating only so long as the borrowing base of cash and mortgages allocated to DB as collateral totaled at least $1.25 billion (the "**Borrowing Base Condition**").  If the Borrowing Base Condition was not satisfied, the trustee would trip this "circuit breaker" to suspend any further outflow of cash and to prevent the automatic monthly renewal of DB's investment.

10.     These carefully crafted safeguards protecting DB's investment from risk were only as reliable as the gatekeeper who administered them.  To ensure that Ocala complied with these measures, DB relied on a credit-worthy trustee/custodian/collateral and depository agent to serve as the gatekeeper that would at all times control: (1) the flow of mortgages into and out

3

of Ocala; (2) the mortgages and cash that were to be held to secure DB's investment; and (3) all accounts in which Ocala's funds were to be held or to which they were to be distributed.

11.    BOA, as successor-in-interest to LaSalle Bank, N.A., assumed this gatekeeper role.  By way of a series of contracts that governed the existence and activities of Ocala, BOA accepted the responsibility to enforce the provisions that had been designed to protect DB's investment.  BOA represented that it would perform its duties with due care, and was obligated by the contracts to do so.  It was BOA's charge to ensure that Ocala at all times retained cash and mortgages totaling at least $1.25 billion to secure DB's investment ("**DB Collateral**").

12.    DB trusted that BOA, one of the nation's largest and most well-known financial institutions, would perform the gatekeeper function reasonably and responsibly.  DB's confidence was echoed by Moody's Investors Service, which, in assigning Ocala an investment grade rating, emphasized the importance of BOA's role and stated that risk to DB and other noteholders was "mitigated by the resources, capability and credit strength of BOA as the trustee, collateral agent, depositary and custodian to provide critical program support services, including: certifying the borrowing base and checking the delinquency triggers before the issuance of Ocala's ABCP; checking in the loan files and creating a collateral transmittal report; and managing the orderly wind-down of the program."  Moody's ABCP Market Review (July 13, 2009).

13.    As it turned out, the faith of DB and other investors was misplaced.  In myriad ways, BOA failed to carry out its various duties designed to protect DB's investment, and these failures substantially damaged Ocala and DB's investment.

14.    First, BOA transferred funds out of the Ocala accounts for unauthorized purposes.  Ocala was permitted to purchase only dry mortgages, so the only legitimate transfers

4

to purchase mortgages for Ocala were those made to an account specified on a bailee letter from the lender who provided the wet funding for the mortgage.  Because Colonial was the source of wet funding for TBW, BOA knew that there was only one such account—Account No. 8026069354 held at Colonial called the Investor Funding Account (the "**Colonial IFA**")—into which Ocala funds could be transferred to purchase mortgages for Ocala.  BOA nonetheless transferred hundreds of millions of dollars of DB's investment to other accounts with no connection to Ocala's purchase of mortgages.  Further, notwithstanding the express prohibition on Ocala's purchase of wet mortgages, BOA nonetheless transferred more than $1.7 billion to a TBW account that BOA knew was used for wet funding of mortgages.  Finally, even when BOA transferred funds to the Colonial IFA, the size of the transfers, contrary to the requirements of the Ocala transaction documents, usually bore no relationship at all to the value of mortgages that BOA understood were to be purchased by Ocala.

15.    Second, BOA failed to track and document properly the purchase and sale of mortgages as would be required for it to report accurately and protect adequately the Secured Parties' beneficial interest in the mortgages.  As late as July 2009, BOA represented to DB that BOA had control of mortgages valued at over one billion dollars securing DB's investment.  In August 2009, following the bankruptcy of TBW, it was revealed that with respect to the great majority of those mortgages, BOA either never had control of them in the first place or already had sold them to Freddie Mac.

16.    Third, BOA breached its express obligation to be able at all times to report to Ocala and its investors the status of mortgages held by BOA for the benefit of the investors.  Not only did BOA breach this duty, it actually reported on a daily basis to DB that BOA was holding certain loans as security for DB's investment when, in reality, these loans already had

been sold to third parties. These misrepresentations led DB to believe that its investment was at all times secured by $1.25 billion of collateral and hid the fact that an event of default already had occurred under the Ocala facility documents that would have given DB the right to accelerate the repayment of DB's investment.

17.     Fourth, BOA knew or should have known that the Borrowing Base Condition was not satisfied for many months prior to the ultimate shut-down of the Ocala facility in August 2009. Yet, during that period BOA repeatedly certified and/or confirmed that the Borrowing Base Condition was satisfied. As a result, DB's investment continued to roll over on a monthly basis, and BOA continued to transfer funds out of Ocala that would have been frozen had BOA correctly reported that the Borrowing Base Condition was not satisfied.

18.     Fifth, BOA failed to segregate and account for the cash and collateral securing DB's investment. The Ocala transaction documents required that funds invested by DB and BNP and all mortgages purchased with such funds were to be accounted for separately to protect DB's and BNP's security interests in their respective investments. BOA nonetheless regularly commingled the funds and failed to segregate effectively the parties' collateral. As a result, BOA has been unable to allocate between DB and BNP what cash and collateral remains in the Ocala accounts at BOA.

19.     In short, BOA had the responsibility for (1) taking possession of mortgages, checking them for completeness and compliance with the Ocala requirements, (2) paying for fully-documented and executed mortgages by sending the appropriate amount to the Colonial IFA, (3) preventing the transfer of Ocala funds for any purpose beyond what was contractually specified, (4) ensuring that mortgages thus purchased remained within BOA's control and/or subject to a BOA lien until BOA obtained payment for such mortgages from a third party, (5)

reporting accurately to DB the status of the collateral, (6) properly segregating the collateral

securing DB's and BNP's respective investments, and (7) renewing those investments on a

monthly basis only if the borrowing base fully secured those investments.  BOA failed to

comply with its contractual obligation to perform these tasks and to do so with due care.

20.     Instead, BOA's breaches of its contractual obligations and negligent acts and

omissions were the direct and proximate cause of the loss of DB's investment in Ocala.  On

August 20, 2009, based upon an event of default, the Ocala ABCP held by DB totaling

$1,201,785,714 became immediately due and payable.  As a direct result of BOA's contractual

breaches, Ocala was unable to pay this amount and failed to pay this amount to DB.  This

Complaint seeks to remedy that wrong.

## PARTIES

21.     Deutsche Bank is a bank organized under the laws of the Federal Republic of

Germany with a branch at 60 Wall Street, New York, New York 10005.

22.     Bank of America is a bank organized under the laws of the State of North

Carolina with a branch a 9 West 57th Street, New York, New York 10019.  Bank of America is

successor in interest to LaSalle Bank, National Association, and assumed, by operation of law,

all of the liabilities and obligations of LaSalle Bank, National Association.  BOA has done and

is doing business in the State of New York.

## JURISDICTION

23.     Personal jurisdiction over the defendant is proper in this Court because Bank of

America conducts business in New York and has agreed in Section 10.09 of the Second

Amended and Restated Security Agreement to irrevocably and unconditionally submit itself to

the jurisdiction of this Court.

24.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) as the controversy is between a citizen of a State and a citizen of a foreign state and Plaintiff seeks damages in an amount well in excess of $75,000.

25.     Venue is proper under 28 U.S.C. § 1391(a), as BOA is a corporation subject to personal jurisdiction in this District, and therefore is deemed a resident of this District pursuant to 28 U.S.C. § 1391(a).

26.     Venue in this district is also proper because BOA consented to the jurisdiction of this Court pursuant to Section 10.09 of the Second Amended and Restated Security Agreement, which provides:

> EACH PARTY HERETO HEREBY SUBMITS TO THE NONEXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND OF ANY NEW YORK STATE COURT SITTING IN NEW YORK CITY FOR PURPOSES OF ALL LEGAL PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT AND ANY CLAIM THAT ANY SUCH PROCEEDING BROUGHT IN SUCH A COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. EACH PARTY HERETO HEREBY CONSENTS TO PROCESS BEING SERVED IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT, OR ANY DOCUMENT DELIVERED PURSUANT HERETO BY THE MAILING OF A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, RETURN RECEIPT REQUESTED, TO ITS RESPECTIVE ADDRESS SPECIFIED AT THE TIME FOR NOTICES UNDER THIS AGREEMENT OR TO ANY OTHER ADDRESS OF WHICH IT SHALL HAVE GIVEN WRITTEN OR ELECTRONIC NOTICE TO THE OTHER PARTIES. THE FOREGOING SHALL NOT LIMIT THE ABILITY OF ANY PARTY HERETO TO BRING SUIT IN THE COURTS OF ANY JURISDICTION.

Section 17 of the Series 2008-1 Depositary Agreement contains a substantially similar forum selection provision.

## FACTUAL ALEGATIONS

### I.    Introduction

27.    Prior to filing for protection under Chapter 11 of the United States Bankruptcy Code on August 25, 2009, TBW had been the 12th-largest mortgage originator in the U.S. and third largest source for FHA loans, and had originated thousands of residential mortgages each year.  As of August 4, 2009, TBW was servicing more than 400,000 mortgages with unpaid principal balances in excess of $80 billion.

28.    In order to originate mortgages in such volumes, TBW required access to abundant and reliable financing.  In or about April 2005, the Ocala facility was created by Lehman Brothers, at the direction of TBW, to serve as a single-seller whole-loan mortgage warehouse conduit for TBW.  Ocala would issue and sell ABCP, the proceeds of which were to be used to provide financing for fixed-rate Freddie Mac conforming mortgages originated by TBW.

29.    On December 13, 2007, DB purchased $750 million of ABCP issued by Ocala in the form of "Secured Liquidity Notes."

30.    Around six months later, on June 30, 2008, DB agreed to invest an additional $450 million in Ocala's ABCP.  Following this additional investment, DB held Secured Liquidity Notes with a face value of $1,201,785,714.  Also on June 30, 2008, BNP purchased Secured Liquidity Notes with a face value of $480,700,000.

31.    Both DB and BNP renewed their investments in the Ocala ABCP on June 30, 2009.

32.     The Secured Liquidity Notes purchased by DB were designated "Series 2008-1" (such notes are hereinafter referred to as "**DB Secured Liquidity Notes**").  The collateral securing DB's investment was also identified with the designation "Series 2008-1."

33.     The Secured Liquidity Notes purchased by BNP were designated "Series 2005-1" (such notes are hereinafter referred to as "**BNP Secured Liquidity Notes**").  The collateral securing BNP's investment was also identified with the designation "Series 2005-1."

34.     The Secured Liquidity Notes, Ocala's use of the funds provided to it thereby, and other critical aspects of the Ocala facility were established and governed by a set of agreements entered into on or about June 30, 2008 ("**Ocala Agreements**").  The Ocala Agreements amended and restated the agreements that had governed the Ocala facility prior to June 30, 2008.

35.     The basic operation of the Ocala facility was fairly straightforward.  Using the funds that had been invested by DB, Ocala was to purchase dry mortgages from TBW.  Any mortgages thus acquired would constitute collateral securing DB's investment.  Ocala would then sell the mortgages to Freddie Mac.  The proceeds of such sales also constituted collateral securing DB's investment.  As long as the Borrowing Base Condition was satisfied, the proceeds of such sales could be used by Ocala to purchase additional mortgages from TBW, and the cycle would begin anew.

36.     A set of "Swap Agreements" served to transfer to TBW all market risk relating to the mortgages purchased by Ocala.  Whether mortgages were sold for more or less than expected, under the Swap Agreements, it would have no ultimate consequence for the value of the DB Collateral or DB's return on its investment.  The strict over-collateralization requirements in conjunction with the Swap Agreements provided assurance that when DB

redeemed the DB Secured Liquidity Notes, it would recover its entire $1.2 billion principal investment.

37.     In short, as long as BOA performed its various roles under the Ocala Agreements with appropriate care, DB's principal investment was to be fully secured and protected, and DB would receive the interest payments provided for in the Secured Liquidity Notes.

**II.     The Ocala Agreements**

38.     The Ocala Agreements executed on or about June 30, 2008 included the following:

a.     The Second Amended and Restated Mortgage Loan Purchase and Servicing Agreement ("**MLPSA**") was entered into between Ocala, as Purchaser, and TBW, as Seller and Servicer.  DB was expressly designated as a third-party beneficiary of the MLPSA in Section 12.15.

b.     The Second Amended and Restated Security Agreement ("**Security Agreement**") was entered into between Ocala, as Issuer, and BOA, as Indenture Trustee and Custodian.  DB was expressly designated as a third-party beneficiary of the Security Agreement in Section 10.18.

c.     The Second Amended and Restated Custodial Agreement ("**Custodial Agreement**") was entered into among Ocala, as Issuer, TBW, as Seller and Servicer, and BOA, as Custodian and Collateral Agent.  DB was expressly designated as a third-party beneficiary of the Custodial Agreement in Section 25.  Furthermore BOA, as Custodial Agent, agreed to indemnify DB against any losses that DB may sustain to the extent attributable to BOA's

"negligence, fraud, bad faith or willful misconduct" in the performance of its duties as Custodial Agent.  Custodial Agreement § 17.

        d.     The Second Amended and Restated Base Indenture ("**Base Indenture**") and the Series 2008-1 Supplement to the Base Indenture were entered into between Ocala, as Issuer, and BOA, as Indenture Trustee and Paying Agent.  DB was expressly designated as a third-party beneficiary of the Base Indenture in Section 13.20.

        e.     The Series 2008-1 Depositary Agreement ("**Depositary Agreement**") was entered into between Ocala, as Issuer, and BOA, as Series 2008-1 Depositary.  DB is a third party beneficiary of the Depositary Agreement pursuant to an indemnification provision in Section 8(g).  Furthermore, the Indenture Trustee is a third-party beneficiary of the Depositary Agreement that may enforce its provisions under Section 15.  DB, as the beneficiary of the Base Indenture, may enforce the rights of the Indenture Trustee under the Depositary Agreement because BOA's dual role as both Indenture Trustee and Depositary Agent creates, with respect to the Depositary Agreement, a conflict of interest for BOA as Indenture Trustee.

        **III.**     **Parties to the Ocala Agreements**

39.     The parties to the Ocala Agreements each performed multiple roles with respect to the Ocala facility.

40.     DB, by virtue of its investment of $1.2 billion and acquisition of the DB Secured Liquidity Notes, obtained rights and privileges under the Ocala Agreements as a "Noteholder," a "Series 2008-1 Senior Noteholder," a "Required Senior Noteholder," and a "Secured Party."

41.     DB also was a party to the Swap Agreements that served to relieve investors in Ocala's ABCP of market risk relating to the mortgages acquired by Ocala.  Pursuant to those agreements, DB held the roles of "Front Swap Counterparty" and "Back Swap Counterparty."

DB's participation in these two agreements was part of an arrangement that served to transfer all market risk regarding the value of mortgages from Ocala to DB, and then from DB to TBW.

42.     Ocala primarily performed three roles.

      a.     As "Purchaser," Ocala would buy from TBW mortgages that would then be sold directly or indirectly to Freddie Mac.

      b.     As "Issuer," Ocala issued ABCP, including the Secured Liquidity Notes.

      c.     As "Front Swap Counterparty," Ocala was insulated against any market risk.  Ocala would not have to absorb various types of potential losses on the mortgages, and by the same token, would not be able to retain potential profits on the mortgages.

43.     TBW primarily performed three roles.

      a.     As "Seller," TBW would originate mortgages and sell those mortgages to Ocala.

      b.     As "Servicer," TBW serviced loans held by Ocala, performing such functions as collecting monthly loan payments from mortgagees, handling mortgagees' escrow accounts, and paying taxes and insurance from such escrow accounts.

      c.     As "Back Swap Counterparty," TBW took on all market risk related to DB's investment by agreeing to absorb various types of potential losses on the mortgages. By the same token, TBW would receive any potential profits on the mortgages.

44.     BOA assumed several pivotal roles through which BOA was to secure the DB Collateral, as well as manage and oversee the accounts into which proceeds from the sales of loans by Ocala were deposited and from which payments for the purchase of mortgages were drawn:

a.    As "Collateral Agent," BOA assumed responsibility to hold for the benefit of DB the security interest in mortgages purchased by Ocala using funds invested by DB, among other responsibilities, and was authorized to serve as an agent of DB.  As Collateral Agent, BOA also held and controlled the funds generated by DB's investment and the subsequent sale of mortgages, and was permitted to transfer those funds only under certain specified conditions and for limited purposes.  *See* Security Agreement §§ 4.01-4.10, 5.01-5.07.

b.    As "Custodian," BOA assumed responsibility to review loan files before they were purchased by Ocala to ensure they complied with the Ocala Agreements, among other responsibilities, and was required to take possession of the mortgages and loan documents acquired by Ocala and hold them for the benefit of the Collateral Agent as representative of DB.  *See* Custodial Agreement §§ 3, 20.

c.    As "Indenture Trustee," BOA assumed numerous responsibilities in connection with the Ocala facility, including the establishment and maintenance of accounts necessary to allocate and distribute interest payable to the Ocala investors.  Base Indenture § 5.1; Base Indenture Supplement § 3.5(a), (b).

d.    As "Depositary," BOA was required, among other responsibilities, to roll over the Secured Liquidity Notes on a monthly basis only after certifying that (i) it had all the necessary information to certify the Borrowing Base Condition and (ii) the Borrowing Base Condition was, in fact, satisfied.

e.    As "Paying Agent," BOA assumed responsibility to pay DB amounts owed to it pursuant to the Ocala Agreements.  Base Indenture Supplement §§ 3.3(b), (d); 3.4(b), (d).

## IV.    Cash and Collateral Cycle

45.    The Ocala Agreements and various bailee letters accompanying the transfer of mortgages established a predictable cycle of cash and collateral through the Ocala facility.

46.    TBW would originate a mortgage with wet funding provided by Colonial, i.e., TBW would transfer Colonial funds to the borrower at the closing while the loan documents were still being signed.

47.    In exchange for providing the funds for the closing, Colonial obtained a security interest in the mortgage thus originated.  Once closing was complete and the promissory note and other loan documents had all been signed, the complete set of loan documents was delivered to Colonial.

48.    After receiving the loan documents, Colonial would then deliver the loan documents to BOA as Custodian for Ocala accompanied by a bailee letter ("**Colonial Bailee Letter**") indicating that the loan documents were being transferred under bailment, subject to Colonial's security interest.  The Colonial Bailee Letter provided that Colonial would release its security interest in the loan documents upon payment of and confirmed receipt of a specified "takeout amount" that represented Ocala's purchase of the mortgages.  The Colonial Bailee Letter provided very precise instructions to BOA as to how payment was to be made, and explicitly stated that Colonial's security interest in the loan documents would be released only if BOA made full payment "as set forth" in the Colonial Bailee Letter.  The Colonial Bailee Letters required that the necessary payment be transmitted to the Colonial IFA.

49.    The Ocala Agreements required TBW to provide BOA with a Transfer Supplement, which was a list of mortgages that TBW proposed that Ocala purchase on any given day.

15

50.    Within two business days of receipt of the loan documents (via the Colonial Bailee Letter) for the mortgages listed on the applicable Transfer Supplement, BOA, as Custodian, was required to review the loan documents and deliver a certificate to the Collateral Agent (also BOA) certifying whether it had received all of the loan documents related to the mortgage to be purchased and specifying any deficiencies in the loan documents.

51.    Once BOA, as Custodian, confirmed that the loan documents were complete (i.e., that the mortgages were now dry), BOA, as Collateral Agent, was to transmit to Colonial the takeout amount, drawn on the appropriate sub-account of the Ocala collateral account ("**Collateral Account**") held at BOA—the sub-account either of DB (the "**DB Sub-Account**" or BNP (the "**BNP Sub-Account**").

52.    BOA was permitted to transfer funds to Colonial only after it had confirmed that BOA was in possession of all necessary loan documents such that once BOA paid the correct take-out amount, it would become the owner of the mortgages for the benefit of Ocala.

53.    Pursuant to the Colonial Bailee Letter, once BOA transmitted the correct takeout amount to Colonial in accordance with the instructions in the Colonial Bailee Letter, Colonial's security interest in the loan documents would be released.

54.    By operation of the Ocala Agreements, Ocala immediately pledged any mortgage thus purchased, including the loan documents, to BOA as the Collateral Agent on behalf of the appropriate Secured Party under the Security Agreement.

55.    The Ocala facility was not permitted to hold mortgages and loan documents for longer than sixty (60) days, and only 10% by value of the mortgages held by Ocala were permitted to be held longer than thirty days.    MLPSA, Ex. H.  The expectation of all parties was that shortly after purchasing a mortgage, Ocala would sell the mortgage to Freddie Mac.

16

56.     At the start of the sale process, BOA, as Collateral Agent, would deliver the loan files to Colonial subject to a form of bailee letter required by the Custodial Agreement ("**BOA Bailee Letter**").  Custodial Agreement, Ex. E.  The BOA Bailee Letter specified that BOA retained its security interest in the loan documents until payment was made pursuant to the instructions in the letter.  The BOA Bailee Letter required that, within fifteen days, Colonial, as Freddie Mac's agent, either return the mortgages or remit payment.

57.     Freddie Mac could pay for the mortgages in two ways.  First, if Freddie Mac were simply purchasing the mortgage for its own account, it would pay with cash deposited directly into the Ocala Collateral Account at BOA.  Alternatively, if mortgages acquired by Freddie Mac were part of a group of mortgages being bundled together as part of a securitization, Freddie Mac would deliver a trust certificate to Bank of New York, the securities clearing agent, who would transmit the proceeds of the sale of this certificate to Colonial, which would then in turn transmit the proceeds to the Ocala Collateral Account.

58.     BOA's security interest in the mortgages was to be released only upon payment by Colonial of the purchase price specified in the applicable BOA Bailee Letter.

59.     The proceeds of the sale of the mortgage to Freddie Mac were then to be deposited in the sub-account of the Ocala Collateral Account from which the funds to purchase that mortgage originally had been drawn.

**V.      BOA's Breach of Its Contractual Duties**

60.     BOA—like all of the parties to the Ocala Agreements—understood and agreed that the primary "purpose" of the Security Agreement, as clearly stated in its Recitals, was "securing and providing for the repayment of all amounts at any time and from time to time owing by the Issuer to each [Secured Party]."  Indeed, the entire Ocala facility was directed at

17

only two purposes: to provide liquidity for TBW to originate mortgages and to protect the Secured Parties' investment.

61.     BOA's responsibilities and duties under the Ocala Agreements were likewise intended to provide multiple layers of protection to preserve the Secured Parties' investment. BOA was required to carry out these responsibilities and duties with appropriate care, and each one of the Ocala Agreements provided that BOA could be liable in the event it performed those duties negligently.

62.     With respect to virtually every key contractual duty required of it under the Ocala Agreements, BOA failed to act with appropriate care.  BOA's negligence subverted the key protections upon which DB depended.  BOA's breaches of its contractual duties and negligence in performing those duties caused DB's investment in Ocala to become severely under-collateralized and directly has resulted in Ocala being unable to pay amounts owed to DB under the DB Secured Liquidity Notes.

### A.     Improper Transfer of Funds from the Collateral Account

63.     To protect the funds in the Collateral Account and DB Sub-Account that ultimately would be used to repay the approximate $1.2 billion in principal invested by DB, the Ocala Agreements imposed very strict and very clear restrictions on the purposes for which the funds could be used.

64.     Section 8.28 of the Base Indenture permitted funds invested by DB to be used for two, and only two, purposes:

> Section 8.28   Use of Proceeds of Notes.  The Issuer shall use the proceeds of Notes solely for one or more of the following purposes: (a) to pay the Issuer's Obligations when due, in accordance

with the Security Agreement; and (b) to acquire
Mortgage Loans from the Seller.

65.    Control of all of the funds invested by DB was entrusted to BOA, as Collateral

Agent.  Section 5.01 of the Security Agreement provides that BOA as Collateral Agent was

required to maintain "a special purpose trust account in the name of and under the control of,

the Collection Agent on behalf of the Secured Parties (said account being herein called the

"Collateral Account" . . .) and sub-accounts thereof for each of the Series 2005-1 Purchased

Assets and the Series 2008-1 Purchased Assets."

66.    Section 5.01 of the Security Agreement further provides that BOA, as Collateral

Agent, "shall have complete dominion and control over the Collateral Account and the Issuer

hereby agrees that only the Collateral Agent may make withdrawals from the Collateral

Account."

67.    Section 5.03 of the Security Agreement authorizes BOA to make withdrawals or

transfers from the Collateral Account and/or DB and BNP Sub-Accounts only for certain

enumerated purposes.  The only permitted transfers out of the Collateral Account and/or the

DB and BNP Sub-Accounts for purposes other than the purchase of mortgages were limited

transfers to Ocala swap transaction participants and the holders of Ocala ABCP and

subordinated notes in accordance with the Ocala Agreements.  The only legitimate transfer out

of the Collateral Account and/or the DB and BNP Sub-Accounts to third parties other than

those swap transaction participants and the holders of Ocala ABCP and subordinated notes was

for the purchase of dry mortgages.

68.    BOA knew that the only manner in which dry mortgages could be purchased

from TBW was through payments to the Colonial IFA.  BOA knew this because all mortgages

TBW delivered to BOA as Custodian for review and potential purchase by Ocala were

19

accompanied by Colonial Bailee Letters specifying that payment for the mortgages had to be directed to the Colonial IFA, and that only payment to that exact account would result in the release of Colonial's security interest in the mortgages.

69.     Despite this knowledge, since June 30, 2008, BOA nonetheless transferred more than $3.7 billion from the Collateral Account and/or the DB and BNP Sub-Accounts to accounts that had no legitimate basis for receiving such funds under the Security Agreement and that were not related to the purchase of dry mortgages for Ocala.  These improper transfers included:

    a.     Approximately $1.7 billion to TBW Account No. 722347.2 (the "**Wet Funding Account**") held at BOA that was used to provide wet funding for mortgages.

    b.     Approximately $837 million to a "FHLMC P&I Custodial Account," an account to accumulate principal and interest for loans serviced by TBW for Freddie Mac;

    c.     Approximately $675 million to a "Custodial Funds Clearing Account," an account for the initial deposit of funds relating to mortgages serviced by TBW;

    d.     Approximately $445 million to a "Colonial Master Account," an account to fund loans made to settlement agents (i.e., the title company or attorney closing the loan for TBW);

    e.     Approximately $58 million to a "Colonial Operating Account," an account to fund TBW's operating expenses; and

    f.     Approximately $2.5 million to an "ITF Henley Holdings Account," an account to accumulate principal and interest relating to loans serviced for Henley Holdings LLC.

70.     These unauthorized transfers began on July 1, 2008, the day after the Ocala

Agreements became effective, and continued through August 2009.

71.     Moreover, between June 30, 2008 and August 4, 2009, BOA transferred over $1

billion to Colonial and other banks in numerous transfers of whole/round number amounts that

bore no relation to any purchase of mortgages.  Whole/round number transfers to purchase

mortgages would be highly unusual because the aggregation of individual mortgages

themselves would not typically be expected to result in whole/round number amounts.

72.     Furthermore, the payments made by BOA to the Colonial IFA on a daily basis

bore no relationship to the value of the mortgages being purchased.  On average, BOA, on

behalf of Ocala, would receive approximately $40-50 million of mortgages for purchase each

day.  In order to pay for those mortgages, BOA was required to pay an amount equal to the face

value of the mortgages to the Colonial IFA.

73.     On some days, BOA failed to transmit the funds to the Colonial IFA necessary

to complete the purchase of those mortgages.  For example, on February 27, 2009, BOA

transmitted only $8.8 million to Colonial despite the fact that BOA's records indicated that

$54.5 million in mortgages were acquired from Colonial that day for the benefit of DB.  By

failing to transmit payment for the mortgages, BOA prevented Ocala from perfecting the

security interests in those mortgages that was intended to serve as the primary collateral for

DB's investment.  BOA nonetheless represented in daily reports to DB that the security

interests had been perfected by accounting for the mortgages as collateral securing DB's

investment.

74.     On other days, BOA transmitted far more money to the Colonial IFA than was

warranted to purchase the mortgages that BOA's records indicate were acquired by BOA for

the benefit of Ocala.  For example, on May 29, 2009, BOA transmitted the large sum of $690 million to the Colonial IFA, despite the fact that BOA's own records indicate that only $36.7 million in mortgages were acquired from Colonial that day for the benefit of Ocala.  By conducting such transfers, BOA permitted the funds invested by DB to be transferred out of Ocala without obtaining mortgages in return.

75.     Prior to June 30, 2008, the agreements governing Ocala permitted it to purchase wet mortgages, and, prior to June 30, 2008, BOA regularly transferred Ocala funds to the Wet Funding Account to purchase wet mortgages.

76.     The Ocala Agreements that became effective on June 30, 2008, however, prohibited the purchase of wet mortgages and, therefore, prohibited the transfer of Ocala funds to the Wet Funding Account.  After June 30, 2008, BOA disregarded this requirement and nonetheless continued to transfer Ocala funds to the Wet Funding Account in contravention of the Ocala Agreements.  In fact, on July 1, 2008, the day after the Ocala Agreements became effective, BOA transferred $63,939,570 from the DB Sub-Account to the Wet Funding Account.

77.     The transfer of funds by BOA out of the Collateral Account and/or DB and BNP Sub-Accounts to accounts that BOA knew or should have known had no permissible purpose, and to the Colonial IFA in amounts that bore no relationship to the value of mortgages supposedly being purchased, was a direct cause of the loss of the DB Collateral and, therefore, the loss of a substantial portion of DB's investment in Ocala.

78.     Under the Security Agreement, BOA was not authorized to release any Ocala funds for the purchase of mortgages unless the Borrowing Base Condition was satisfied.  From June 30, 2008 through August 2009, BOA regularly breached its obligation to ensure that no

funds were transferred from the Ocala Collateral Account or the DB or BNP Sub-Accounts when the Borrowing Base Condition was not satisfied.  BOA's transfer of Ocala funds out of the Collateral Account the DB or BNP Sub-Accounts in contravention of this obligation directly and proximately caused the loss of a substantial portion of DB's investment in Ocala.

**B.    BOA's Misrepresentations of the State of DB Collateral**

79.    As both Custodian and Collateral Agent, BOA was required to know at all times which mortgages it physically held at its facility, which mortgages had been delivered under the required BOA Bailee Letter and which mortgages had been purchased by third parties.

80.    During the summer of 2008, DB requested that BOA provide it with a daily list of the mortgage loans and cash held by BOA as DB Collateral, so that DB would know on a daily basis that its investment was secured by $1.25 billion of collateral in accordance with the Ocala Agreements.

81.    BOA was required under the Custodial Agreement to have such information readily available.  Section 9.1 of the Custodial Agreement required BOA to be able to provide to Ocala, upon one business day's notice, a list of all mortgages held for the benefit of DB, including all mortgages "paid off, repurchased, sold or otherwise released by [BOA]." Custodial Agreement § 9.1.  In other words, BOA was required to be able to tell Ocala and its investors at any given time the status of the mortgages held by BOA as collateral for the benefit of investors.

82.    In connection with its duties under the Custodial Agreement, BOA agreed to provide DB with a daily report of all such mortgage loans (the "**BOA Loan Reports**"), and began transmitting these reports to DB in September 2008.  The BOA Loan Reports listed each mortgage loan held by BOA for the benefit of DB, and noted whether the loan was either still

23

in the physical possession of BOA or out to a prospective third party purchaser pursuant to a

BOA Bailee Letter.  Having assumed this additional daily reporting obligation, BOA was

required to perform it in a non-negligent manner.

83.    In August 2009, after TBW collapsed, DB discovered that the BOA Loan

Reports were false.  For example, the August 12, 2009 BOA Loan Report showed that there

was approximately $1,160,530,265 in mortgages securing DB's investment.  BOA's own

internal information, however, shows that at least $470 million of these mortgages already had

been delivered and sold to Freddie Mac at least two weeks prior to the date of the BOA Loan

Report and so could not have constituted collateral securing DB's investment.  Further, on

information and belief, as of August 12, 2009, there were virtually no mortgages held by BOA

to secure DB's investment.

84.    This false reporting of the state of the collateral securing DB's investment began

almost a year prior to TBW's collapse.  For example, on September 15, 2008, the date on

which BOA delivered the first BOA Loan Report, BOA represented that the amount of

mortgages securing DB's investment was approximately $1,147,268,192.  BOA's own internal

information, however, shows that only about half of these mortgages totaling about $538

million were either still on hand or had not been delivered and/or sold to Freddie Mac.

85.    On information and belief, hundreds (and potentially all) of the BOA Loan

Reports delivered by BOA to DB during the period between September 15, 2008 and August 4,

2009 were similarly false.

86.    Had BOA properly reported the amount of mortgages securing DB's investment,

DB would have known of the under-collateralization of its investment, and could have

prevented the loss of its investment.

24

C.      **BOA's Failure to Secure the Mortgages**

87.     As both Custodian and Collateral Agent, BOA was responsible for maintaining custody and control of the mortgages that secured DB's investment.

88.     In August 2009, however, after TBW and Colonial collapsed, DB discovered that BOA did not have ownership, possession, or control of virtually any of the mortgages that were listed on the BOA Loan Reports.

89.     BOA has been unable to produce the mortgages that it represented to DB as being held by BOA on behalf of DB.  Moreover, BOA has been unable to account for where the mortgages are or even to establish that the mortgages were ever purchased by Ocala.

90.     BOA's inability to produce or account for the mortgages that were supposed to be the collateral for DB's investment stems from, among other things, BOA's failure to keep records concerning the purchase and sale of mortgages on behalf of Ocala.

91.     With respect to the purchase of mortgages, BOA failed to maintain the internal documentation necessary to establish Ocala's ownership of purchased mortgages.  BOA recently admitted to DB that it failed to maintain loan level detail with respect to the mortgages it purchased.  As such, BOA has been unable to prove with specificity that it paid for any particular mortgage or that it was paid by third parties for particular mortgages.

92.     BOA also failed to obtain documentation from third parties necessary to establish Ocala's purchase and ownership of mortgages.  BOA failed to obtain letters from Colonial confirming Colonial's release of its security interest with respect to particular mortgages for which BOA transmitted payment to Colonial.

93.     BOA's failure to obtain such documentation was particularly egregious because BOA was fully aware that Colonial was TBW's and/or Freddie Mac's agent with respect to the

sale of mortgages by Ocala to Freddie Mac. BOA, therefore, would have to transfer mortgages back to Colonial (as Freddie Mac's agent) pursuant to a BOA Bailee Letter after having purchased the mortgages from Colonial (as TBW's agent). The possibility existed that once BOA transferred the mortgages to Colonial, Colonial could assert ownership of the mortgages and refuse to either return the mortgages or remit payment received from Freddie Mac for the mortgages unless BOA could prove that Colonial's security interest had been released. This made it even more critical that BOA document that it properly had taken the steps necessary to release Colonial's security interest in the mortgages, and that Colonial had in fact released that interest.

94.     On information and belief, Colonial, and/or the Federal Deposit Insurance Corporation ("**FDIC**") acting as receiver for Colonial, asserts that mortgages for which BOA claimed to have paid Colonial, and in which BOA claimed to hold a security interest on behalf of DB, in fact, belonged to Colonial. Colonial, and/or the FDIC acting as receiver for Colonial, contend that BOA never remitted payment to Colonial as required in the Colonial Bailee Letters pursuant to which the mortgages had initially been transferred by Colonial to BOA.

95.     BOA also failed to maintain proper documentation and to track mortgages over which it had asserted control and that it subsequently released to prospective third-party purchasers.

96.     Pursuant to Section 8 of the Custodial Agreement, BOA as Custodian was authorized to release mortgages to prospective third-party purchasers only if BOA accompanied delivery of the mortgage with a BOA Bailee Letter to be executed by the purchaser. BOA was further required to collect all transmittal letters executed by prospective third-party purchasers.

97.    The contractually-required form of the BOA Bailee Letter was set forth in Exhibit E to the Custodial Agreement, and provided that the third-party purchaser either return the mortgage or remit the sales proceeds within fifteen days from the date of the letter.  Section 8 of the Custodial Agreement further required that if a prospective third-party purchaser to whom BOA as Custodian delivered mortgages for review did not proceed with the proposed purchase, the mortgages were to be returned promptly to BOA as Custodian.

98.    BOA as Custodian and Collateral Agent failed to ensure that third-party purchasers to whom it had transmitted loans for purchase complied with the fifteen-day time period.  On information and belief, BOA failed even to collect executed copies of transmittal letters.  The failure of BOA as Custodian and Collateral Agent to promptly recover the mortgages from third-party purchasers after the fifteen-day time period had passed was a breach of BOA's contractual duties and duty of due care and violated customary standards applicable to an entity charged with maintaining continuous custody and control of mortgages.

99.    BOA further breached its duties as Custodian and Collateral Agent by failing to keep track of the Ocala mortgages that were being sold to Freddie Mac.  In connection with those sales, Freddie Mac required that BOA submit a specific form of release known as Form 996E, which contained a list of the mortgages to be sold to Freddie Mac.  In contravention of its contractual duties, BOA failed to keep track of or verify when these Form 996Es were being submitted to Freddie Mac and which Ocala mortgages were to be sold to Freddie Mac.

100.    In dereliction of its responsibilities as Custodian and Collateral Agent, BOA regularly made no effort to recover mortgages worth hundreds of millions of dollars delivered to prospective third-party purchasers for review, even after sixty days or more had elapsed

27

without the prospective purchasers remitting payment or returning the mortgages as required by the BOA Bailee Letters.

101.    By August 12, 2009, BOA had allowed approximately $158 million of mortgages delivered by it to prospective third-party purchasers to remain outstanding for more than sixty days, notwithstanding the fifteen-day limit set forth in the BOA Bailee Letters. When Colonial went into FDIC receivership, it was too late for BOA to recover the mortgages.

102.    As Custodian and Collateral Agent, BOA's negligent failure to maintain custody and control of Mortgages in accordance with the Ocala Agreements, the contractually required BOA Bailee Letters, and customary standards caused the loss of the DB Collateral and, therefore, the loss of a substantial portion of DB's investment.

**D.     BOA's False Certifications of the Borrowing Base Condition**

103.    BOA also failed to properly carry out another of its key responsibilities—the responsibility to review, certify, and/or confirm that the Borrowing Base Condition was met.  If BOA had correctly calculated the Borrowing Base Condition, it would have been required to take actions that effectively would have shut down the Ocala facility and prevented any further depletion of the DB Collateral.

104.    The Borrowing Base Condition was a built-in "circuit breaker" that was designed to prevent further deterioration of the cash and collateral in the event that the cash and collateral securing DB's investment declined to the point that repayment of DB's principal was at risk.

105.    The Borrowing Base Condition was a calculation that essentially measured the indebtedness of Ocala (primarily consisting of its obligations to noteholders) against its assets (primarily consisting of cash and mortgages).  This would reveal whether the DB Secured

Liquidity Notes were adequately secured in accordance with the Ocala Agreements.  If DB's investment was not so secured, then the facility would be in violation of the Borrowing Base Condition, and this would trigger two important consequences: (1) the Secured Liquidity Notes would not be rolled over, but instead would become immediately due and payable, and/or (2) no new purchases of mortgages would be permitted, thus halting Ocala's outlay of further cash, unless and until the Borrowing Base Condition was again satisfied.

106.    It was BOA's contractual responsibility to ensure that the Borrowing Base Condition was satisfied before permitting the Secured Liquidity Notes to be rolled over or permitting Ocala to transfer funds for the purpose of purchasing additional mortgages.

107.    Pursuant to Section 4(d) of the Depositary Agreement, BOA as Depositary was precluded from issuing or delivering any Secured Liquidity Notes unless it received from Ocala a completed certificate demonstrating that the Borrowing Base Condition was met, and then BOA "upon review, determined that it can (and it does) certify as to [satisfaction of the Borrowing Base Condition]"  The Secured Liquidity Notes had a thirty day maturity.  Thus, each month BOA had the obligation to <u>review and certify</u> a calculation establishing whether the DB Secured Liquidity Notes were secured by $1.25 billion of collateral.

108.    As BOA acknowledged orally to DB and in a letter to BNP dated March 27, 2009, BOA's duty to certify whether the Borrowing Base Condition was met pursuant to Section 4(d) of the Depositary Agreement "play[ed] an important role in mitigating the risks" that the Secured Parties "would otherwise incur."

109.    Furthermore, pursuant to Sections 5.03(a) and (b) of the Security Agreement, BOA as Collateral Agent was precluded from transferring or withdrawing funds from the Collateral Account and/or the DB and BNP Sub-Accounts for the purpose of enabling Ocala to

purchase additional mortgages from TBW unless the Borrowing Base Condition was met.
Thus, on every occasion BOA transferred funds to pay for Ocala's acquisition of new
mortgages, BOA was required first to confirm whether the DB Secured Liquidity Notes were
fully secured.

110.    BOA regularly certified and/or confirmed that the Borrowing Base Condition
was met when, based on BOA's own information, BOA knew or should have known that, in
fact, the Borrowing Base Condition was far from satisfied.  The key to the Borrowing Base
Condition was determining whether Ocala actually held $1.25 billion in cash and mortgages
securing the DB Secured Liquidity Notes.  This was a determination that only BOA could make
because only BOA knew what mortgages it held in its vault and which mortgages already had
been sold to Freddie Mac.  BOA knew what mortgages had been sold to Freddie Mac because,
as a condition of each sale to Freddie Mac, BOA was required to execute a Freddie Mac Form
996E that served as a release of the security interest in the Ocala mortgages to be sold to
Freddie Mac.

111.    On information and belief, from June 30, 2008, through August 4, 2009, BOA,
on hundreds of occasions, either falsely certified or failed in its contractual duty to confirm that
the Borrowing Base Condition was satisfied.

112.    BOA has failed to provide DB with the vast majority of Borrowing Base
Condition certificates.  The few certificates that BOA provided are clearly and demonstrably
false showing that DB's investment was severely under-collateralized:

a. On May 20, 2009, BOA certified that it held mortgages worth
$1,134,028,581 as DB Collateral.  In reality, on May 20, 2009, BOA knew or should have
known that it held or had a lien on approximately $547 million in mortgages as DB Collateral.

b. On June 20, 2009, BOA certified that it held mortgages worth $1,208,009,892 as DB Collateral. In reality, on June 20, 2009, BOA knew or should have known that it held or had a lien on approximately $440 million in mortgages as DB Collateral.

c. On June 30, 2009, BOA certified that it held mortgages worth $1,226,886,314 as DB Collateral. In reality, on June 30, 2009, BOA knew or should have known that it held or had a lien on approximately $468 million in mortgages as DB Collateral.

d. On July 20, 2009, BOA certified that it held mortgages worth $1,216,398,908 as DB Collateral. In reality, on July 20, 2009, BOA knew or should have known that it held or had a lien on approximately $476 million in mortgages as DB Collateral.

113. On information and belief, between June 30, 2008 and August 4, 2009, BOA falsely certified that the Borrowing Base Condition was satisfied at least thirteen times when, in fact, the Borrowing Base Condition was not satisfied.

114. Had BOA acted with due care in reviewing the Borrowing Base Condition, BOA would have known that it could not certify and/or confirm that the Borrowing Base Condition had been met. By operation of the Ocala Agreements, the "circuit breaker" then would have tripped, shutting down further financing and further purchases of mortgages and minimizing losses to the collateral. BOA's failure to perform its obligations with respect to reviewing, certifying, and confirming the Borrowing Base Condition prevented those safeguards from taking effect, resulting in the loss of a substantial portion of DB's investment.

**E.     BOA's Failure to Segregate Loans and Proceeds**

115. The Ocala Agreements required that DB's investment and BNP's investment be kept separate. This was necessary to ensure that the cash and collateral separately securing the DB and BNP Secured Liquidity Notes would be identifiable. If cash and collateral were not

carefully and accurately identified and segregated, it would be difficult or impossible to know which Secured Party had a secured interest in any particular cash or collateral, and the possibility of competing claims could arise.

116.    The Security Agreement contained provisions that, if adhered to, would preclude any chance of such confusion or commingling of funds.  Pursuant to Section 5.01 of the Security Agreement, BOA as Collateral Agent was required to maintain two distinct sub-accounts of the Collateral Account; one relating to the Series 2005-1 Collateral (the BNP Sub-Account) and the other relating to the Series 2008-1 Collateral (the DB Sub-Account).

117.    Careful segregation by BOA of cash and collateral was essential not only to identifying each Secured Party's individual security interests, but also to key operational aspects of the Ocala facility.

118.    For example, most of the authorized purposes for which funds could be transferred out of the Collateral Account pursuant to Section 5.03 of the Security Agreement make reference to the specific DB and BNP Sub-Account from which funds can be drawn to make such payment.

119.    Most critically, Section 5.03 required that only funds from the DB Sub-Account be used to fund the purchase of Series 2008-1 Mortgage Loans, and, similarly, that only funds from the BNP Sub-Account be used to fund the purchase of Series 2005-1 Mortgage Loans.

120.    Thus, as a practical matter it was also necessary for BOA as Collateral Agent, Indenture Trustee, and Custodian to track whether mortgages being purchased correlated to Series 2005-1 or Series 2008-1, because BOA had to ensure that funds were withdrawn from the appropriate DB or BNP Sub-Account to purchase any given loan, and that the proceeds from the sale of such a loan were deposited in the appropriate DB and BNP Sub-Account.

121.    BOA acted in disregard of its contractual duty to maintain the DB and BNP Sub-Accounts separately, and to withdraw from and deposit into the DB and BNP Sub-Accounts the appropriate funds.  On information and belief, BOA did not just commingle the accounts—it made no meaningful attempt to segregate either mortgages purchased or the proceeds from sale of mortgages.

122.    BOA's failure to segregate appropriately the mortgages and funds became evident after an event of default under the Base Indenture was declared in August 2009.  At that time, BOA had not allocated between the DB and BNP Sub-Accounts what few mortgages and funds remained in its possession.  BOA's initial effort at allocation—a simple 50/50 split of mortgages and funds between the two accounts (disregarding that DB's investment was more than twice the size of BNP's investment) revealed the extent to which BOA had disregarded its duties to keep loans and mortgages properly segregated.  BOA quickly withdrew that arbitrary allocation.  To date, BOA has been unable or unwilling to make a proper allocation of the mortgages and funds.

123.    As a result of BOA's failure to properly segregate the mortgages and funds, BOA has impaired DB's security interest in the mortgages and funds that should have properly been segregated into the DB Sub-Account.  BOA's continuing delay in allocating the mortgages and funds has caused and continues to cause damage to DB.

**VI.    BOA's Failure to Pay Amounts Due under the Secured Liquidity Notes Following Ocala Default**

124.    On or about August 4, 2009, the FHA announced that it had disqualified TBW from making FHA-insured loans, stating that TBW had failed to submit a required financial report and to disclose certain irregular transactions that raised concerns of fraud.  Shortly

thereafter, Freddie Mac and the Government National Mortgage Association terminated TBW as a servicer of their mortgages and barred TBW from selling mortgages to them.

125.    On August 4, 2009, the New York Times reported that the FBI and the Special Inspector General of the Treasury Department's Troubled Asset Relief Program had raided Colonial and TBW.

126.    On information and belief, on August 6, 2009, BOA requested that Colonial return all of the loans held by Colonial pursuant to the BOA Bailee Letters.  The vast majority of these loans had been out to Colonial on BOA Bailee Letters for more than 60 days, grossly exceeding the fifteen-day limitation set forth in the BOA Bailee Letter.

127.    On August 7, 2009, Colonial BancGroup disclosed that it was the target of a criminal investigation by the U.S. Department of Justice relating to its mortgage lending unit and related accounting irregularities, and that it might be placed under receivership.

128.    On August 10, 2009, BOA as Indenture Trustee declared an indenture event of default stating that the notes were due and payable because of TBW's loss of approved seller status.

129.    On August 14, 2009, Colonial was closed by the Alabama State Banking Department, and the FDIC was named Receiver.

130.    On August 20, 2009, the outstanding DB Secured Liquidity Notes in the amount of $1,201,785,714 held by DB became immediately due and payable.  Ocala has failed to pay this amount.

131.    On August 24, 2009, TBW filed for relief pursuant to Chapter 11 of the United State Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Florida.

132.    To date, BOA has failed to recover any DB Collateral and to pay the amounts due to DB under the DB Secured Liquidity Notes.


**COUNT I**
**BREACH OF CONTRACT (SECURITY AGREEMENT)**

133.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

134.    DB was expressly designated as a third-party beneficiary of the Security Agreement.  Security Agreement §§ 10.08, 10.18.

135.    BOA understood that a primary "purpose" of the Security Agreement was "securing and providing for the repayment of all amounts at any time and from time to time owing by the Issuer to each [Secured Party]."  Security Agreement at 1.

136.    The Security Agreement created a continuing security interest in the Collateral in favor of BOA for the benefit of the Secured Parties.  Security Agreement, Sched. III, § 1. The Security Agreement provided that BOA, as Collateral Agent, was an agent of each of the Secured Parties.  *Id.*

137.    BOA was required to exercise due care in performing its duties under the Security Agreement.  If BOA failed to perform those duties and/or was negligent in performing those duties, the Security Agreement provides that BOA would be liable to DB for resulting damages.

    a.    Pursuant to Section 4.10 of the Security Agreement, BOA is liable for negligent actions taken or omitted to be taken by it relative to the DB Collateral.

b.      Pursuant to Section 8.01 of the Security Agreement, BOA is liable for actions taken or omitted to be taken by it as Collateral Agent that are negligent, fraudulent, in bad faith, or that constitute willful misconduct.

138.    BOA breached its duties under the Security Agreement and was negligent in performing those duties, including by:

a.      Failing to ensure that the security interest it held on behalf of the Secured Parties was perfected by obtaining written confirmation from Colonial that it had released any security interest in mortgages for which BOA paid Colonial; and

b.      Failing to keep accurate and adequately detailed records sufficient to permit BOA to establish and prove with specificity the security interest it held on behalf of the Secured Parties.

139.    BOA violated the Security Agreement by transferring funds out of the Collateral Account and/or the DB and BNP Sub-Accounts to accounts and for purposes not specifically permitted by the relevant provisions of the Security Agreement, including by:

a.      Pursuant to Section 8.28 of the Base Indenture, BOA was aware that Ocala was prohibited from using the proceeds of the Secured Liquidity Notes for any reason other than (a) to pay obligations owed by Ocala under the Security Agreement to security holders and (b) to acquire dry mortgages from TBW.

b.      BOA was permitted to transfer funds only for the purposes established in Sections 5.03(a) and (b) of the Security Agreement.  The sole purpose for which funds could be transferred (other than in connection with the internal operation of the facility) was for the purchase of dry mortgages.  BOA was aware that dry mortgages could be purchased only by transfer of funds to the Colonial IFA Account.

36

       c.      BOA transferred hundreds of millions of dollars to accounts that BOA knew or should have known were unrelated to any of the purposes enumerated in Sections 5.03(a) and (b) of the Security Agreement.  Every transfer by BOA of funds out of the Collateral Account and/or the DB and BNP Sub-Accounts to such accounts violated Sections 5.03(a) and (b) of the Security Agreement.

       d.      BOA transferred more than $1.7 billion to the Wet Funding Account for the purchase of wet mortgages when BOA knew that the Ocala Agreements prohibited the purchase of wet mortgages.

140.    BOA violated Sections 5.03(a) and (b) of the Security Agreement by transferring funds out of the Collateral Account and/or the DB and BNP Sub-Accounts when BOA knew or should have known that the Borrowing Base Condition was not satisfied and that funds in the Collateral Account and/or the DB and BNP Sub-Accounts could therefore not be used to purchase mortgages.

141.    BOA violated Sections 5.01 and 5.03 of the Security Agreement by failing to properly segregate mortgages it purchased and funds it received from the sale of such mortgages as between the DB Sub-Account and the BNP Sub-Account.

142.    As a result of its contractual breaches, BOA directly and proximately caused the loss of a substantial portion of the cash and mortgages from which Ocala was required to repay the DB Secured Liquidity Notes, and to which DB would have had recourse in the event of a failure by Ocala to repay the DB Secured Liquidity Notes.

## COUNT II
## BREACH OF CONTRACT (DEPOSITARY AGREEMENT)

143.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

144.    Pursuant to Section 8(g) of the Depositary Agreement, DB is a third party beneficiary of the Depositary Agreement.  Section 8(g) specifically provides DB the right to be indemnified for losses to Ocala caused by BOA's negligence under the Depositary Agreement.

145.    Furthermore, Section 15 of the Depositary Agreement provides that the Indenture Trustee is a third-party beneficiary of the Depositary Agreement that may enforce its provisions.  The Indenture Trustee is obligated to act for the benefit of the Secured Parties, but BOA, as Indenture Trustee, is incapable of doing so here due to the fact that BOA has a conflict and cannot sue itself.  Because BOA faces an irreconcilable conflict rendering it unable to carry out its duty as Indenture Trustee, DB, as the beneficiary of the Base Indenture, is entitled to assert the Indenture Trustee's rights under Section 15 directly against BOA as Depositary.

146.    BOA was required to exercise due care in performing its duties under the Depositary Agreement.  If BOA was negligent in performing those duties, the Depositary Agreement provides that BOA would be liable to DB for resulting damages.

   a.    Pursuant to Section 8(d) of the Depositary Agreement, BOA is liable for actions taken or omitted to be taken by it as Depositary that are negligent, fraudulent, in bad faith, or that constitute willful misconduct.

   b.    Pursuant to Section 8(d) of the Depositary Agreement, BOA must indemnify DB against any losses sustained by the Issuer attributable to BOA's negligence, fraud, bad faith, or willful misconduct in the performance of its duties.

     c.     Pursuant to Section 11(d) of the Depositary Agreement, BOA is liable for errors in judgment made by in good faith by a responsible officer if BOA was negligent in ascertaining the pertinent facts or in making such judgment based on available facts.

     147.     BOA breached its duties under the Depositary Agreement and was negligent in performing those duties, including by:

     a.     Falsely certifying on a monthly basis that the Borrowing Base Condition was satisfied pursuant to Section 4(d) of the Depositary Agreement when BOA knew or should have known that the Borrowing Base Condition had not been satisfied.

     b.     Improperly issuing on a monthly basis new Secured Liquidity Notes pursuant to Section 4(d) of the Depositary Agreement when BOA knew or should have known that the Borrowing Base Condition had not been satisfied.

     148.     As a result of its contractual breaches, BOA directly and proximately caused the loss of a substantial portion of the cash and mortgages from which Ocala was required to repay the DB Secured Liquidity Notes, and to which DB would have had recourse in the event of a failure by Ocala to repay the DB Secured Liquidity Notes.

## COUNT III
## BREACH OF CONTRACT (CUSTODIAL AGREEMENT)

     149.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

     150.     The Custodial Agreement provides that DB is entitled to the rights and benefits of the Custodial Agreement and may enforce the provisions of the Custodial Agreement as if it were a party.  Custodial Agreement § 25.

151. BOA was required to exercise due care in performing its duties under the Custodial Agreement. If BOA failed to perform those duties and/or was negligent in performing those duties, the Custodial Agreement provides that BOA would be liable to DB for resulting damages.

a. Pursuant to Section 19(c) of the Custodial Agreement, BOA is liable for actions taken or omitted to be taken by it as Custodian that are negligent, fraudulent, in bad faith, or that constitute willful misconduct.

b. Pursuant to Section 17 of the Custodial Agreement, BOA must indemnify DB as a Secured Party against any losses sustained by Ocala attributable to the Custodian's negligence, fraud, bad faith, or willful misconduct in the performance of its duties as Custodian.

c. Pursuant to Section 6(b)(i) of the Custodial Agreement, BOA was required to maintain continuous custody and control of the Mortgages on behalf of Ocala subject to the security interest of the Collateral Agent in accordance with customary standards for such custody, and was liable for any loss resulting from the Custodian's negligence or misconduct.

152. BOA violated Section 8 of the Custodial Agreement by either releasing Mortgages to third-party purchasers without transmittal letters in the form specified by Exhibit E to the Custodial Agreement and/or by failing to collect from the third-parties the executed transmittal letters.

153. BOA violated Section 8 of the Custodial Agreement by failing to ensure that prospective third-party purchasers to whom it had transmitted loans for purchase either returned

40

the mortgages or remitted payment for the mortgages within the fifteen day time period set forth in the required transmittal letters.

154.    BOA breached its duties under the Custodial Agreement and was negligent in performing those duties, including by:

      a.    Failing to obtain and/or keep records adequate to identify the mortgages purchased by Ocala and held by BOA;

      b.    Failing to obtain and/or keep records adequate to demonstrate that Colonial had released its security interest in mortgages for which BOA transferred payment to Colonial and of which BOA took possession on behalf of Ocala;

      c.    Failing to ensure that with respect to mortgages released by BOA to third-party purchasers as bailees, BOA recovered either the mortgage or the proceeds from the sale of the mortgage; and

      d.    Misrepresenting to DB on a daily basis that BOA had custody and control of DB Collateral over which it knew or should have known it did not have custody or control.

155.    BOA negligently performed the daily reporting obligation it expressly undertook to provide in connection with its performance under the Custodial Agreement.

156.    As a result of its contractual breaches, BOA directly and proximately caused the loss of a substantial portion of the cash and mortgages from which Ocala was required to repay the DB Secured Liquidity Notes, and to which DB would have had recourse in the event of a failure by Ocala to repay the DB Secured Liquidity Notes.

## COUNT IV
## INDEMNIFICATION

157.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

158.     Pursuant to Section 8(g) of the Depositary Agreement, Section 17 of the Custodial Agreement, and Section 8.05 of the Security Agreement, BOA must indemnify DB against any losses attributable to the BOA's negligence, fraud, bad faith, or willful misconduct in the performance of its duties.

159.     BOA was negligent in performing its duties as Depositary, Custodian and Collateral Agent, including by:

a.     Falsely certifying on a monthly basis that the Borrowing Base Condition was satisfied pursuant to Section 4(d) of the Depositary Agreement when BOA knew or should have known that the Borrowing Base Condition had not been satisfied.

b.     Improperly issuing on a monthly basis new Secured Liquidity Notes pursuant to Section 4(d) of the Depositary Agreement when BOA knew or should have known that the Borrowing Base Condition had not been satisfied.

c.     Failing to obtain and/or keep records adequate to identify the mortgages purchased by Ocala and held by BOA as Custodian;

d.     Failing to obtain and/or keep records adequate to demonstrate that Colonial had released its security interest in mortgages for which BOA transferred payment to Colonial and of which BOA took possession on behalf of Ocala;

e.      Failing to ensure that with respect to mortgages released by BOA to third-party purchasers as bailees, BOA either recovered the mortgage or the proceeds from the sale of the mortgage; and

f.      Providing false reports to DB indicating that BOA had custody and control of DB Collateral over which it knew or should have known it did not have custody or control.

160.    As a result of its negligence, BOA directly and proximately caused the loss of a substantial portion of the cash and mortgages from which Ocala was required to repay the DB Secured Liquidity Notes, and to which DB would have had recourse in the event of a failure by Ocala to repay the DB Secured Liquidity Notes.

161.    BOA is required to indemnify DB for this loss and has failed to do so.

**RELIEF REQUESTED**

Wherefore, Plaintiff prays for relief and judgment as follows:

      a.     An award of compensatory damages and other damages available by law in an amount to be proved at trial, plus pre-judgment interest as permitted by law;

      b.     An award of Plaintiff's attorneys' fees, costs and other expenses; and

      c.     Such other and further relief as is just and proper.

Dated: November 25, 2009

                 WILLIAMS & CONNOLLY LLP

                 By: _____

                     William E. McDaniels
                     Stephen D. Andrews
                     Stephen P. Sorensen
                     Daniel M. Dockery
                     Katherine O'Connor (KL-0902)
                     725 Twelfth Street, N.W.
                     Washington, DC 20005
                     Telephone: (202) 434-5000
                     Facsimile: (202) 434-5029
                     ssorensen@wc.com
                     sandrews@wc.com
                     ddockery@wc.com

                     *Attorneys for Plaintiff Deutsche Bank, AG*